United States District Court
District Of Maine

| | | |
|---|---|---|
| Randi Kirshbaum, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | No. 23-00138-LEW |
| | ) | |
| Saga Communications of New, | ) | |
| England, LLC, d/b/a Portland Radio | ) | |
| Group, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Saga Communications, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

## First Amended Complaint for Violation of Civil Rights and Demand for Jury Trial

Randi Kirshbaum complains against Defendants Saga

Communications, Inc. ("Saga") and Saga Communications of New England,

LLC, ("Saga New England"), collectively referred to as "Employer" or "Saga

Defendants") as follows:

## Summary of the Action

1.      Despite her very favorable performance reviews, on May 18,

2020, Randi Kirshbaum was fired from her radio job of 38 years when she

refused to defy her doctor's advice that she continue to work from home and not risk her life by working in person in a compressed workspace during the early, especially deadly phase of the COVID-19 global pandemic.

2.    In 2009, Ms. Kirshbaum's mother passed away from pulmonary fibrosis. Her mother's pulmonologist told Ms. Kirshbaum that she would likely inherit a genetic predisposition for idiopathic pulmonary fibrosis (IPF). Pulmonary fibrosis is an incurable, complex, genetic disorder. Genetic mutations and disorders increase a person's risk of developing pulmonary fibrosis, and then exposure to certain environmental factors, including viral infections, triggers the disease.

3.    In May 2020, Ms. Kirshbaum was in a high-risk category for severe illness or death from COVID-19 for three fundamental reasons. First, at 66 years old, Ms. Kirshbaum had an increased risk of serious complication, serious illness, or death from COVID-19 because of her age. Second, Ms. Kirshbaum suffered from frequent and serious lung infections, including pneumonia, which significantly increased her risk of developing a severe case of COVID-19. Third, Ms. Kirshbaum's genetic predisposition for pulmonary fibrosis increased the risk that she would develop pulmonary fibrosis if she contracted COVID-19, a viral infection.

4.    Following Governor Mills' March 15, 2020 declaration of a state of emergency and issuance of an executive order mandating all nonessential

workers to remain at home, Ms. Kirshbaum's primary care doctor advised her to avoid leaving her home unless it was absolutely necessary. Her doctor based this advice on her medical opinion that Ms. Kirshbaum was particularly vulnerable to COVID-19.

5.  Though Ms. Kirshbaum successfully worked from home in the opening months of the COVID-19 pandemic, in May 2020, the Saga Defendants arbitrarily called her back to work full time in the office. In support of her request to work from home, Ms. Kirshbaum connected her doctor with Saga's human resources. Her doctor explicitly supported Ms. Kirshbaum's request to continue working from home. The Saga Defendants responded by terminating her employment.

6.  Ms. Kirshbaum was terminated from her employment by the Saga Defendants on May 18, 2020, in violation of her rights under (1) the Maine Whistleblowers' Protection Act, 26 M.R.S. §§ 831-840 (MWPA); (2) the Maine Human Rights Act, 5 M.R.S. §§ 4551-4634 (MHRA), including 5 M.R.S. §§ 19301-19302 (prohibiting discrimination against an employee on the basis of genetic information concerning that individual and providing for remedies under the MHRA); (3) the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 (ADA); (4) the Genetic Information Nondiscrimination Act of 2008, Pub. L. No. 110-233, 122 Stat. 881 (codified in scattered sections of 29 & 42 U.S.C. including 42 U.S.C. §§ 2000ff–1(a), 2000ff-6 (GINA)); (5) the

3

Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634 (ADEA); and

(6) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17

(Title VII).

## Parties

7.      Plaintiff, Randi Kirshbaum, is a citizen of the United States and

she lived in Scarborough, Maine during all of 2020.

8.      Defendant Saga Communications, Inc. ("Saga"), is a corporation

organized under the laws of the State of Delaware and headquartered in

Michigan. It has more than 500 employees.

9.      Its subsidiary, Saga Communications of New England, LLC,

("Saga New England") does business under the name Portland Radio Group.

Portland Radio Group has an established place of business in South Portland,

Maine.

10.     Saga and Saga New England operated as joint employers of Ms.

Kirshbaum and as a single, integrated employer of Ms. Kirshbaum. For

example, the decision to fire Ms. Kirshbaum and the process leading up to

her termination involved employees of Saga, including its then CEO, Ed

Christian, its Human Resources Director, Annette Calcaterra, and its Senior

Vice President of Operations, Chris Forgy; all three had their primary work

offices at Saga's headquarters in Grosse Point, Michigan.

## Jury Trial Demand

11.    Plaintiff demands trial by jury on all issues triable by a jury.

## Jurisdiction and Venue

12.    This action arises under the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 (ADA); (4) the Genetic Information Nondiscrimination Act of 2008, Pub. L. No. 110-233, 122 Stat. 881 (codified in scattered sections of 29 & 42 U.S.C. including 42 U.S.C. §§ 2000ff–1(a), 2000ff-6 (GINA)); (5) the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634 (ADEA); and (6) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17 (Title VII), and supplemental jurisdiction over Plaintiff's state law claims, the Maine Whistleblowers' Protection Act, 26 M.R.S. §§ 831-840 (MWPA) and the Maine Human Rights Act, 5 M.R.S. §§ 4551-4634 (MHRA).

13.    Venue is proper in the District of Maine under 28 U.S.C. § 1391(b)(1)(2) because Cumberland County is where Saga New England has its primary place of business and where Plaintiff lived during all of 2020.

## Facts

14.    Ms. Kirshbaum has worked in the radio industry for over 50 years.

15.    In 1970, she started her career as the only woman on the air in Minneapolis/St. Paul, Minnesota. She then worked in radio in Washington, DC, and Boston.

16.    In 1982, Ms. Kirshbaum started working for the Saga Defendants in Portland, Maine. In 1983, she was promoted to Program Director.

17.    Ms. Kirshbaum was inducted into the Maine Association of Broadcasters Hall of Fame in 2006 and received the National Association of Broadcasters Marconi Radio Award in 2011.

18.    Ms. Kirshbaum's mother passed away from pulmonary fibrosis in 2009 when she was 75 years old. She got it in her mid-60s after being exposed to respiratory syncytial virus ("RSV"). Her mother's pulmonologist informed Ms. Kirshbaum and her siblings that their mother likely had a hereditary form of pulmonary fibrosis and that meant that she and her siblings likely have a genetic predisposition to pulmonary fibrosis.

19.    Pulmonary fibrosis is a progressive and generally fatal disease characterized by scarring of the lungs that causes an irreversible loss of the tissue's ability to transport oxygen. It ultimately robs a patient of the ability to breathe. It is a chronic obstructive pulmonary disease.

20.    As of May 2020, Ms. Kirshbaum had a history of chronic, severe lung infections, including bronchitis and pneumonia. Her episodic lung

illness would generally require her to miss about a week or two of work annually.

21.    Ms. Kirshbaum's chronic, severe lung infections impair her respiratory health to a significant extent as compared to what is ordinarily experienced in the general population. For example, Ms. Kirshbaum's chronic lung infections cause her to experience difficulty breathing and working for weeks at a time on a frequent (annual) basis.

22.    In addition, Ms. Kirshbaum's chronic, severe lung infections constitute a physical impairment of her respiratory system that is episodic and when active substantially limits her ability to breathe, work, and participate in other major life activities.

23.    Saga was aware of Ms. Kirshbaum's respiratory impairments because she needed to take sick leave roughly once a year to recover from her severe lung infections.

24.    On March 15, 2020, Governor Janet Mills declared a Civil State of Emergency for the State of Maine because of the COVID-19 pandemic and issued measures to protect the public's health and safety due to very serious threats of severe illness or death from the coronavirus pandemic.

25.    On March 23, 2020, Ms. Kirshbaum sought advice from her primary care physician, Dr. Allyson Howe, about her individualized risk of exposure to COVID-19.[1]

26.    Based on her assessment of Ms. Kirshbaum's age and other health risk factors, Dr. Howe strongly recommended that Ms. Kirshbaum work from home due to the COVID-19 pandemic and Ms. Kirshbaum's heightened and significant risk of severe illness or death if Ms. Kirshbaum contracted COVID-19.

27.    On March 23, 2020, Ms. Kirshbaum emailed the General Manager (GM) of the station, Bob Adams, and Business Manager Nancy O'Brien. In Ms. Kirshbaum's email, she explained that her doctor advised her to minimize her exposure to other workers because she was in a high-risk

---

[1] Genetic mutations and disorders play a major causal role in developing IPF. For example, a January 2022 scholarly article concludes that "Genetic factors play an important role in the development of IPF." And it also states: "Environmental exposure and genetic predisposition may have a synergistic effect in the development of IPF . . . ." Further, it notes a "link between viral infection and increased risk of IPF." Qianru Mei, et al., *Idiopathic Pulmonary Fibrosis: An Update on Pathogenesis* 12 FRONTIERS IN PHARM. 1, 2 (2022). Similarly, a scientific study published in October 2016 described IPF as "an incurable complex genetic disorder that is associated with sequence changes in 7 genes . . . and with variants in at least 11 novel loci" and that one of these genetic variants "is the strongest risk factor (genetic and otherwise), accounting for 30-35% of the risk of developing IPF, a disease that was previously considered idiopathic." Christopher M. Evans et al., *Idiopathic Pulmonary Fibrosis: A Genetic Disease That Involves Mucociliary Dysfunction of the Peripheral Airways* 96 PHYSIOLOGICAL REVIEWS 1567 (2016).

category for suffering a serious complication, serious illness, or death as a result of contracting the COVID-19 virus.[2]

28.    On March 23, 2020, Dr. Howe also recommended that Ms. Kirshbaum record her shows at the studio and then go home to do the rest of her work remotely. Ms. Kirshbaum provided GM Adams and Business Manager O'Brien a supporting note from Dr. Howe dated March 23, 2020.

29.    On March 24, 2020, Governor Mills issued Executive Order 19 FY 19/20 ("March 24 Order") requiring all non-essential businesses and operations to close their public-facing physical locations, meaning those that allow customer, vendor, or other in-person contact. By contrast, certain "Essential Businesses and Operations" were permitted to remain open. But under the March 24 Order, even those essential businesses were mandated "to [the] maximum extent practicable [to] have their employees work remotely."

---

[2] Along with other complications and illnesses associated with COVID-19, Ms. Kirshbaum had a significant risk of developing pulmonary fibrosis—an especially severe and usually fatal disease—as a result of contracting COVID-19. It was reported as of May 2021 that "[m]any COVID-19 patients show symptoms of acute lung injury that eventually leads to pulmonary fibrosis." Joowon Yim, et al., *COVID-19 and Pulmonary Fibrosis: Therapeutics in Clinical Trials, Repurposing, and Potential Development* 44 ARCH. PHARM. RES. 499, 499 (2021); *see also* Sarah Halawa, et al., *Potential long-term effects of SARS-CoV-2 infection on the pulmonary vasculature: a global perspective* 19 Nature Reviews Cardiology 314, 327 (2022) ("Lung fibrosis is increasingly being recognized as one of the important sequelae of COVID-19" (citing four other studies)). Ms. Kirshbaum's risk of developing pulmonary fibrosis was especially heightened because of her likely genetic predisposition for the disease.

30.    The March 24 Order incorporated by reference a federal list of essential businesses that included "[w]orkers who support radio, television, and media service, including, but not limited to front line news reporters, studio, and technicians for newsgathering."  Ms. Kirshbaum's primary job duties did not include front line newsgathering or reporting responsibilities. Rather, her broadcasts were primarily focused on music and entertainment and her other job duties were primarily focused on supervision and management.

31.    In addition, the federal guidance supporting the federal list expressly stated that even for essential businesses, "[w]orkers should be encouraged to work remotely when possible and focus on core business activities. In-person, non-mandatory activities should be delayed until the resumption of normal operations." This list was also explicitly "advisory in nature" and not "a federal directive of standard."

32.    The official memorandum accompanying the federal list further explained that "identified sectors and workers are not intended to be the authoritative or exhaustive list of critical infrastructure sectors and functions that should continue during the COVID-19 response. Instead, State and local officials should use their own judgment in using their authorities and issuing implementation directives and guidance. Similarly, critical infrastructure industry partners will use their own judgment, informed by this list, to

ensure continued operations of critical infrastructure services and functions. **All decisions should appropriately balance public safety while ensuring the continued delivery of critical infrastructure services and functions."** (emphasis added).

33.     Even assuming for the sake of argument that Ms. Kirshbaum was an essential worker under the March 24 Order (but she was not), she reasonably believed her Employer could not lawfully require her to work in person under the March 24 Order.

34.     The March 24 Order required that all essential businesses and operations "shall to [the] maximum extent practicable have their employees work remotely." Ms. Kirshbaum reasonably believed it was practicable for her to perform her job duties remotely.

35.     The March 24 Order also required that essential businesses "comply with social distancing requirements," including "maintaining six-foot social distancing" for employees "at all times." Ms. Kirshbaum's office space had communal spaces that could not be avoided, and the office was too small to allow for such social distancing if all employees were required to work in person. Thus, Ms. Kirshbaum reasonably believed her Employer could not comply with the social distancing order and therefore could not require her to work in person.

36.    As it became increasingly clear in March 2020 that COVID-19 had become a public health emergency, Ms. Kirshbaum's fears and anxiety about her own risk of contracting COVID-19 from working in person in her compressed office space—and of then developing pulmonary fibrosis— worsened her preexisting mental disabilities of recurrent major depression, anxiety, post-traumatic stress disorder, and binge-eating disorder.

37.    Ms. Kirshbaum's chronic and episodic major depression, anxiety, post-traumatic stress disorder, and binge-eating disorder are mental impairments that, when active, substantially limit her major life activities of operation of her brain as well as caring for oneself, concentrating, thinking, communicating, interacting with others, and working.

38.    The Saga Defendants were aware of Ms. Kirshbaum's mental disabilities dating back to 2012. For example:

a)  Ms. Kirshbaum had several discussions with Marcia Lobaito, then director of human resources for Saga, about her depression, anxiety, and eating disorder. HR Director Lobaito worked closely with Ms. Kirshbaum to navigate taking FMLA for in-patient treatment for the eating disorder and trauma;

b)  Ms. Kirshbaum received in-patient treatment for 90 days from June through August of 2012. During these 90 days of in-patient treatment, Ms. Kirshbaum regularly updated HR Director Lobaito on her progress;

c) After 2012, Ms. Kirshbaum checked in with then Senior Vice President Lobaito to update her on her mental health status. Effective March 13, 2020, after 33 years with Saga, Ms. Lobaito retired from her position as Senior Vice President and Director of Business Affairs. At the request of Saga, Ms. Lobaito continued to serve as its Corporate Secretary;

d) Upon Ms. Kirshbaum's return to work in August of 2012, she had extensive discussions with Saga New England's then General Manager, Cary Pahigian, about her mental health and on-going outpatient treatment;

e) After Mr. Pahigian was replaced by Bob Adams in 2014, Mr. Adams and Ms. Kirshbaum had several discussions about her mental health, and she let him know that she was under the care of a psychiatrist and was on medication for major depression and anxiety;

f) In 2020, shortly before the pandemic began, Mr. Adams and Ms. Kirshbaum again discussed that she was under psychiatric care and on medication for major depression and anxiety; and

g) After the pandemic hit and Ms. Kirshbaum began working remotely, she told Mr. Adams about her heightened anxiety over possibly having to return to working in the office.

39.   On April 1, 2020, Ms. Kirshbaum consulted again with Dr. Howe,

who again recommended that Ms. Kirshbaum work exclusively from home because of the increasing number of outbreaks of COVID-19 in Cumberland County and the high risk that COVID-19 posed to Ms. Kirshbaum.

40.     At Ms. Kirshbaum's request, Dr. Howe wrote a note to Saga asserting her medical opinion. Dr. Howe's note stated, "the CDC is recommending that reducing exposure to the community is preferred at this time. I recommend that Randi work exclusively from home at this time."

41.     Ms. Kirshbaum provided Dr. Howe's note to GM Adams who then passed it along to Human Resources Director Annette Calcaterra.

42.     With Ms. Kirshbaum's permission, HRD Calcaterra spoke with Dr. Howe on about April 1, 2020, to address any questions or concerns Saga management had about her April 1 note directing Ms. Kirshbaum to work exclusively from home.

43.     HRD Calcaterra's notes from her conversation with Dr. Howe state: "Randi is age 66, high risk. She wants limited exposure to staff. I asked what additional could be provided for Randi to remain working in the station. She said her own office, studio and bathroom."

44.     On April 1, 2020, Ms. Kirshbaum began working remotely from her home in compliance with Dr. Howe's instructions.

45.     On about April 2, 2020, GM Adams provided Ms. Kirshbaum with a confidential work from home Agreement from HRD Calcaterra.

14

46. On April 3, 2020, Ms. Kirshbaum emailed HRD Calcaterra to notify her that she would not be signing the Agreement because she was entitled to a reasonable accommodation under the American with Disabilities Act, "particularly as I can perform my essential duties remotely. It is improper to attach any conditions to granting an accommodation. This is an ongoing interactive process."

47. On April 3, 2020, Ms. Kirshbaum also advised HRD Calcaterra that she might be forced to go out on leave under the Family Medical Leave Act (FMLA) if Saga refused to accommodate Ms. Kirshbaum's request to work from home.

48. HRD Calcaterra responded in an April 4, 2020 email: "The Agreement that was provided to you would have granted you accommodations to work from home for two weeks. The two-week trial would allow us to determine if the arrangement was working for us, based on your essential Brand Manager Programming job duties."

49. After follow-up discussions between Ms. Kirshbaum's then attorney and Saga's attorney, John Hancock, changes were made to the Agreement. On April 8, 2020, Ms. Kirshbaum signed the revised work from home Agreement. Senior Vice President of Operations Chris Forgy signed the Agreement on behalf of Saga.

50. The Agreement stated:

15

Employer shall permit Employee to perform all normal work activities and duties from her place of residence. The Term shall be automatically extended for additional periods of two weeks (2) weeks (the "Extension Term"), until Employer provides Employee with written notice of non-extension at any time during the current Term or Extension.

.      .      .

If conditions arise to the extent that Employer has to provide Employee/Manager with written notice of non-extension, Employer shall also provide the reason that working remotely is no longer feasible for the on-going effective operation of the programming oversight of the company. If the Employer and Employee are unable to reach an agreement or solution, Employee/Manager understands that Employer may end Employee's working from home.

51.     From April 1 until May 17, Ms. Kirshbaum worked remotely from her home. She was able to effectively perform all essential duties of her job, including the management of her three staff. They were all seasoned employees she had trained and worked successfully with before the COVID-19 pandemic struck.

52.     One of her staff members said he preferred not having Ms. Kirshbaum in the office because they were able to communicate more effectively, face-to-face, by videoconference, without having to distance or wear masks as they would if they were in the office together.

53.     GM Adams told Ms. Kirshbaum that she was the "best work-from-home-er he had ever seen."

16

54.    On April 29, 2020, Governor Mills extended the stay-at-home Executive Order due to COVID-19 for another month, through May 31, 2020.

55.    On May 4, 2020, HRD Calcaterra emailed Ms. Kirshbaum notice of the non-extension of her temporary work from home Agreement with an effective date of May 11, 2020.

56.    The notice said: "Working remotely is no longer feasible for the on-going effective operation of the programming oversight of the Company as the State is reopening."

57.    Other radio stations, including iHeartRadio, Cumulus, Entercom/CBS, Hubbard, Radio One, Townsquare Media—including their five stations in Portland, Maine—were then allowing their managers to work remotely based on the guidelines of the CDC and State public health authorities.

58.    Ms. Kirshbaum responded to HRD Calcaterra and let her know that she would consult with her doctor for medical guidance. She also provided HRD Calcaterra with a copy of Governor Janet Mills' Executive Order, which extended stay-at-home restrictions through May 31, 2020.

59.    CEO Ed Christian and HRD Calcaterra called GM Adams on May 5, 2020, to ask how things had been going with Ms. Kirshbaum's work from home arrangement. GM Adams told them Ms. Kirshbaum had not "missed a beat" working remotely.

17

60.    On May 5, 2020, Ms. Kirshbaum had a telemedicine appointment with Dr. Howe to discuss whether she could safely return to working in-person in the office. Ms. Kirshbaum notified Dr. Howe that Ms. Kirshbaum's mom died with pulmonary fibrosis when she was 75 years old and that she developed it after being exposed to respiratory syncytial virus (RSV). Ms. Kirshbaum also explained that her mom's doctor told her that she was at risk for pulmonary fibrosis.

61.    Dr. Howe told Ms. Kirshbaum that there is a significant genetic risk that goes with pulmonary fibrosis and that about 30% of first-degree relatives can be affected, with many of those not knowing they have a problem until some triggering event—like a severe lung infection—starts the process.

62.    Dr. Howe and Ms. Kirshbaum then discussed Ms. Kirshbaum's history of frequent, serious lung infections.

63.    Given the risks COVID-19 posed to Ms. Kirshbaum based on her age, frequent lung infections, and genetic predisposition for pulmonary fibrosis, Ms. Kirshbaum told Dr. Howe she was nervous to leave home, even for medical appointments and testing.

64.    Ms. Kirshbaum also expressed anxiety over the thought of returning to work in person because she felt she would not be safe from COVID-19 in the office. She explained to Dr. Howe that her physical work

office was relatively small with compressed common area spaces, and that it would be very difficult to avoid contact with other workers in common areas. She also noted that other workers had not been wearing masks at work to reduce or prevent the transmission of COVID-19.

65.     Dr. Howe again advised Ms. Kirshbaum to work from home based on the risk factors of her age, her frequent lung infections, and her mom's history of fatal pulmonary fibrosis.

66.     Ms. Kirshbaum explained to Dr. Howe that Saga was demanding that she provide some form of risk analysis to see if she could safely work in person at the office. Dr. Howe agreed to speak the following week with HRD Annette Calcaterra about her risk assessment and whether Ms. Kirshbaum could safely return to working in person at the office.

67.     On May 5, 2020, following the telemedicine appointment with Dr. Howe, Ms. Kirshbaum forwarded her updated medical note from Dr. Howe to HRD Calcaterra. The note stated:

> Unfortunately the risk of coronavirus infection continues in our area. Because of the risk factors that Randi has (age and medical comorbidities), I am concerned that she would be at significant risk of serious illness if she were to contract the virus. I recommend that she work remotely until further notice.

68.     On May 8, 2020, HRD Calcaterra responded that, as a manager, Ms. Kirshbaum needed to return and resume her oversight of programming

19

in the building rather than remotely. She extended the work from home Agreement by one additional week to May 18 but wrote, "If you elect not to return, this will be considered a voluntary resignation."

69.    Ms. Kirshbaum responded to HRD Calcaterra's email by forwarding her remote work log, Dr. Howe's medical note, information from the EEOC on guidance for employers in the context of the COVID-19 pandemic, and a renewed request for a conference call to implement in good faith the resolution process provided by paragraph 4 of the work from home Agreement.

70.    Ms. Kirshbaum also wrote, "Under no circumstances should you consider that I am voluntarily resigning from the company to which I have dedicated 38 years. Nor should I be forced to choose between my health and my job."

71.    A conference call was scheduled for May 13 between HRD Calcaterra, Saga Attorney John Hancock, Senior Vice President of Operations Chris Forgy, Ms. Kirshbaum's then attorney Robert Kline, Dr. Howe, and Ms. Kirshbaum.

72.    During the May 13 conference call, Dr. Howe conveyed the following information to Saga senior management:

a.    She reiterated that Ms. Kirshbaum is at high risk for severe illness or death if she contracted COVID-19 because of her age and familial

20

pulmonary fibrosis and went on to detail Ms. Kirshbaum's familial risk for pulmonary fibrosis;

    b.     She outlined the Maine CDC and US CDC age-based guidelines for COVID-19;

    c.     She detailed Ms. Kirshbaum's familial risk for pulmonary fibrosis, noting that she had a 31-32% risk of developing the disease if triggered by a serious respiratory component which is a primary component of the COVID-19 infection;

    d.     She reinforced her recommendation that Ms. Kirshbaum continue to work remotely to minimize her exposure to COVID-19; and

    e.     She pointed out that CDC guidance is evolving as we continue to better understand the risks and that what is recommended today could easily change in a month.

73.    Mr. Forgy said that Ms. Kirshbaum was not able to lead from home and that she needed to be in the office because the office was returning to normal operations.

74.    Mr. Forgy would only allow Ms. Kirshbaum to continue to work from home if she relinquished all management responsibilities, which would mean a demotion and a $50,000 pay cut.

75.    Mr. Forgy issued an ultimatum: if Ms. Kirshbaum did not accept the demotion or return to the office on May 18, she would be laid off.

76.     The Saga Defendants were aware that Ms. Kirshbaum had underlying mental disabilities, including episodic anxiety and depression, that further supported the need for the reasonable accommodation of allowing her to work from home during a once-in-a-century global pandemic. But Saga prematurely shut down the interactive process with this take-it-or-leave-it ultimatum and failed to make a reasonable, good faith effort to provide an accommodation for Ms. Kirshbaum.

77.     On the evening of May 17, Ms. Kirshbaum sent a letter to Mr. Forgy again outlining her management successes while working remotely, her desire to retain her position at the Portland Radio Group, and a request that Saga reconsider its stance on her request to work from home. She reiterated that denying her request was inconsistent with the EEOC's guidance on COVID-19 and the ADA, and that the Portland office's compressed workspace made social distancing infeasible.

78.     On the morning of May 18, Mr. Forgy sent a reply email and officially terminated Ms. Kirshbaum's 38-year-long career with Saga, only five days after Dr. Howe disclosed to Saga information about Ms. Kirshbaum's mother's familial and fatal pulmonary fibrosis.

79.     Saga engaged in unlawful discrimination based on Ms. Kirshbaum's genetic information, that is, the information that she had a family history of a fatal and genetic form of pulmonary fibrosis.

22

80.    Mr. Forgy then sent an email about Ms. Kirshbaum to all employees at the Portland Radio Group and to all general managers of all Saga Communications stations. This email informed them of Ms. Kirshbaum's new employment status and revealed the terms of her confidential work from home Agreement.

81.    After Saga terminated Ms. Kirshbaum's employment, Mr. Forgy spoke to the press about her termination and said, "We need to have leadership in the building. You don't lead from a bedroom in your slippers."

82.    Mr. Forgy's comment that Ms. Kirshbaum could not "lead from a bedroom in [her] slippers"—even though she had successfully worked from home for almost two months before her termination—reflected stereotypes that women, especially older women, tend to be weak leaders. This deep-seated, implicit bias against women leaders follows from stereotypical traits associated with men and women.

83.    The characteristics typically associated with effective leaders are aligned with masculine cultural stereotypes, including the stereotypes that men are more likely than women to be competitive, adventurous, aggressive, courageous, dominant, and able to stand up under pressure. By contrast, the cultural stereotypes for women—including that women are more delicate, emotional, sympathetic, gentle, sensitive, supportive, kind, and nurturing— tend to be misaligned with leadership characteristics and to be associated

with more collaborative roles. These stereotypes lead to unconscious gender bias against the ability of women to be strong or effective leaders in the workplace.[3]

84.     A pervasive stereotype is that women aren't agentic–or decisive and authoritative. Because those are the types of traits traditionally associated with men and with leaders, unconscious bias against female leaders is prevalent.[4]

85.     Mr. Forgy's demonstrably false claim that Ms. Kirshbaum could not be an effective leader "in [her] slippers" reflected his and Saga's negative attitudes toward women in leadership roles or positions of power.

86.     When Ms. Kirshbaum was promoted to Program Director in 1982, there were only one or two female Program Directors at Saga, out of a total of about twenty Program Directors.

87.     Over the next thirty-seven years, Ms. Kirshbaum observed that it was rare for women to be promoted to Program Director. Throughout her employment, up to and including 2020, the vast majority of Saga's Program Directors were men. Ms. Kirshbaum was the only Program Director at her facility in Portland, Maine for her entire thirty-seven-year tenure.

---

[3] Victoria L. Brescoll, *Leading with their hearts? How gender stereotypes of emotion lead to biased evaluations of female leaders*, 27 Leadership Q. 415, 416 (2016); *see also* Manuela Tremmel & Ingrid Wahl, *Gender stereotypes in leadership: Analyzing the content and evaluation of stereotypes about typical, male, and female leaders*, 14 Frontiers in Psychology 1034258 (2023), available at https://doi.org/10.3389/fpsyg.2023.1034258.
[4] Brescoll, *supra*; Tremmel & Wahl, *supra*.

88.     Out of 27 markets and 154 radio stations, Saga Defendants employ about 32 male Program Directors or Brand Managers and only about two or three female Program Directors or Brand Managers.

89.     The General Manager of Portland Radio Group has always been male.

90.     From approximately 2006 to 2020, only one woman served as Director of Sales at Portland Radio Group, and her tenure lasted less than one year. After her departure in 2020, Saga Defendants hired a male external candidate to fill the Director of Sales position.

91.     Between 2001 and 2020, a longtime sales account executive who was female was passed over for promotions to management positions in the Sales Department on multiple occasions, despite 20 years of relevant experience and a record of high achievement on sales performance metrics. She separated from Saga in 2020.

92.     Between 2001 and 2020, most female employees who were promoted to management positions worked in human resources or promotions and event planning, which are stereotypically considered women's work.

93.     Social science and historical evidence demonstrate that human resources and other female-dominated subfields or specializations—so-called "female ghettos"—emerge as the result of sex stereotyping that pushes

women into more communal variants of management roles and excludes women from traditional management roles that have historically been male-dominated, effectively maintaining a sex-segregated workforce.[5]

94.    In addition to the sexist pattern of promotions and hiring for management positions at Saga, Ms. Kirshbaum frequently observed and experienced sexist behavior and sexist stereotyping throughout her employment at Saga.

95.    For example, former General Manager Cary Pahigian, a man who supervised Ms. Kirshbaum for about 18 years (from about 1996 to about 2014), often would start telling a sexual joke during a meeting and then stop to declare that Ms. Kirshbaum's "delicate ears can't hear this."

96.    Former GM Cary Pahigian also openly commented on women's physical appearances and attractiveness. He did not make similar comments about men.

97.    On another occasion, former GM Pahigian asked a new female employee who was married to a woman if she watched the television drama "The L Word" because its main characters were primarily lesbian. The employee responded that she had not seen the show. GM Pahigian responded

---

[5] *See* Alice H. Eagly et al., *Gender Stereotypes Have Changed: A Cross-Temporal Meta-Analysis of U.S. Public Opinion Polls From 1946 to 2018*, 75 Am. Psychologist 301 (2020), online advance publication available at https://www.apa.org/pubs/journals/releases/amp-amp0000494.pdf.

by bringing the employee taped copies of recent episodes and attempted to discuss graphic sexual scenes with her while at work.

98.     Such openly sexist behavior was condoned and implicitly encouraged by Saga, which maintained an "old boys club" atmosphere throughout Ms. Kirshbaum's employment. For example, at work conferences, it was common for male leaders and managers at Saga to gather to drink brandy and smoke cigars in groups that excluded Ms. Kirshbaum and other female Program Directors.

99.     Between March and November 2020, Saga terminated the employment of at least eight full-time employees over age 50 at the Portland Radio Group, and two employees over the age of 50 resigned from the Portland Radio Group.

100.    On May 29, 2020, Governor Mills issued an Executive Order reiterating, "all businesses and operations shall to the extent practicable continue to have their employees work remotely."

101.    Upon information and belief, since the termination of Ms. Kirshbaum's employment, Saga Defendants have required employees with underlying health conditions to report in-person to work in the office, but has not enforced requirements for employees to wear masks during meetings or other indoor, face-to-face interactions.

102.   On September 25, 2020, Saga Defendants notified Ms. Kirshbaum in writing that they were terminating her employment effective September 25, 2020, based on a pretextual reason that Saga Defendants knew was false.

103.   The misconduct alleged in this termination letter relates to the solicitation and use of Nielsen ratings information. In truth, this alleged misconduct was engaged in and encouraged by Saga Defendants' management officials.

104.   Indeed, at least two of Ms. Kirshbaum's former co-workers including a manager engaged in the same conduct that was cited in this termination letter. Both are male, and at least one remains employed by Saga. Only Ms. Kirshbaum was singled out for accessing Nielsen ratings information.

105.   Before the filing of this civil action, Ms. Kirshbaum (1) filed a timely complaint with the Maine Human Rights Commission and the federal Equal Employment Opportunity Commission alleging age, disability, sex, and genetic information discrimination as well as retaliation based on protected activity and whistleblower retaliation; and (2) both the MHRC and the EEOC issued a right-to-sue letter to her including under 5 M.R.S. § 4612 (6).

## Legal Claims

106.    The allegations in the preceding paragraphs are realleged.

107.    In violation of the MWPA, MHRA, ADA, ADEA, GINA, and Title VII, Saga Defendants unlawfully discriminated against Ms. Kirshbaum, including by denying her reasonable accommodation and terminating her employment, when one of the determining factors for their adverse actions was her genetic information, disability, sex, and age, her protected activity under the MWPA, and her protected activity opposing unlawful discrimination. In addition, Saga Defendants interfered with Ms. Kirshbaum's rights under the FMLA.

108.    Saga Defendants discriminated against Ms. Kirshbaum and terminated her employment in violation of the MWPA when one of the determining factors for their adverse actions was that she, acting in good faith, (1) reported to her employer orally and in writing, what she had reasonable cause to believe was a violation of Governor Mills' stay-at-home Executive Order of March 24, 2020 and the subsequent extensions of that Order, and a violation of the Americans with Disabilities Act according to then-existing EEOC guidance; (2) reported to her employer orally and in writing, what she had reasonable cause to believe was a condition or practice that would put at risk her health or safety and made her report to shed light

29

on and in opposition to a safety-related concern; and (3) refused to carry out a directive to work in person in the office when complying with that directive would expose her to a condition that could result in serious injury or death. She did so after having sought and been unable to obtain a correction of the dangerous condition from her employer.

109.   Ms. Kirshbaum has a physical disability under the ADA and MHRA. Ms. Kirshbaum suffers from chronic and episodic serious lung infections, which required medical treatment and caused her to miss work time on about an annual basis.

110.   These chronic episodic lung infections substantially limit her major life activity of breathing. They also significantly impair her physical health, with an actual duration of more than 6 months and impairing health to a significant extent as compared to what is ordinarily experienced in the general population.

111.   Saga Defendants were aware of this physical disability due to Ms. Kirshbaum's yearly requests for medical leave to recover from the lung infections.

112.   Ms. Kirshbaum has mental disabilities under the ADA and MHRA. Ms. Kirshbaum is diagnosed with recurrent major depression (or major depressive disorder), anxiety disorder, post-traumatic stress disorder, and binge-eating disorder.

113.   Ms. Kirshbaum's recurrent major depression, post-traumatic stress disorder, and binge-eating disorder are mental impairments that substantially limit the major life activity of operation of her brain.

114.   Saga was aware of Ms. Kirshbaum's mental disabilities, including her anxiety and major depression, between March and May 2020.

115.   Ms. Kirshbaum's physical health conditions made her uniquely susceptible to severe illness or death if she contracted COVID-19, and being forced to return to her office during the height of the COVID-19 pandemic exacerbated her anxiety and major depression.

116.   Ms. Kirshbaum requested to work from home as a reasonable accommodation for her disabilities, which put her at a higher risk for contracting COVID-19 and which were exacerbated by the COVID-19 pandemic.

117.   At all times relevant to this action, Ms. Kirshbaum could perform all essential functions of her position with a reasonable accommodation.

118.   At all times relevant to this action, reasonable accommodations including remote work were available to Saga Defendants that would reduce Ms. Kirshbaum's exposure to COVID-19.

119.   Saga Defendants denied Ms. Kirshbaum's request for reasonable accommodation in May 2020, including by issuing her the ultimatum of returning to in-person work or termination. When they stood by this

ultimatum, Saga Defendants ignored their affirmative obligation to engage in an informal interactive process as required by the ADA. An interactive process is a timely, good-faith, and flexible dialogue between an employer and an employee to identify and assess actual or potential "reasonable accommodations" for the employee's disability or disabilities. Saga Defendants did not articulate how Ms. Kirshbaum continuing to work from home would cause them undue hardship.

120.    Saga Defendants retaliated against Ms. Kirshbaum for requesting a reasonable accommodation. Roughly one month after Ms. Kirshbaum requested the reasonable accommodation of working from home and provided HRD Calcaterra with the note from Dr. Howe outlining her medical conditions, Saga Defendants terminated Ms. Kirshbaum's employment.

121.  Ms. Kirshbaum's association with a family member (her mother) with a disability (fatal familial, pulmonary fibrosis) was a determining factor in Ms. Kirshbaum's termination. Once Saga Defendants learned Ms. Kirshbaum's mother had a fatal and genetic form of pulmonary fibrosis, they wanted to get rid of her because they thought she was "likely to develop the disability as well." *Larimer v. IBM*, 370 F.3d 698, 700 (7th Cir. 2004) (disability by association prohibition applies when an employee is fired because "one of the employee's blood relatives has a disabling ailment that

has a genetic component and [the employer believes] the employee is likely to develop the disability as well (maybe the relative is an identical twin)").

122.   Ms. Kirshbaum's age was a determining factor in her termination. During their May 13, 2020 conference call, Dr. Howe reiterated that Ms. Kirshbaum's age, among other things, increased her risk of severe illness or death if she contracted COVID-19. Five days later Mr. Forgy notified her that her employment was terminated.

123.   In violation of GINA, Ms. Kirshbaum's genetic information was a determining factor in her termination. During their May 13, 2020 conference call, Dr. Howe revealed that Ms. Kirshbaum's family history made her 31-32% more likely to develop familial pulmonary fibrosis. Five days later, Mr. Forgy notified Ms. Kirshbaum that her employment was terminated.

124.   GINA prohibits an employer from firing an employee based on "genetic information," which is defined to include "the manifestation of a disease or disorder in family members of such individual." 42 U.S.C. § 2000ff(4). "[T]he phrase 'manifestation of a disease or disorder in family members' refers to an employee's 'family medical history,' interpreted in accordance with its normal understanding as used by medical providers." *Maxwell v. Verde Valley Ambulance Co., Inc.*, No. cv-13-08044, 2014 WL 4470512, *16 (D. Ariz. Sept. 11, 2014) (quoting 29 C.F.R. § 1635.3(c)(iii)). Maine law similarly prohibits an employer from discharging or otherwise

discriminating against an employee on the basis of genetic information concerning that individual except when based on a bona fide occupational qualification. 5 M.R.S. § 19302.

125.   Ms. Kirshbaum's sex was a determining cause of her termination. Saga Defendants relied in part on the commonly known stereotype that women are weaker and less effective leaders when deciding to terminate Ms. Kirshbaum's employment, and then falsely claimed that her termination was justified because of alleged misconduct that is commonly engaged in by male Saga employees, including managers.

126.   Saga Defendants interfered with Ms. Kirshbaum exercising her right to take unpaid medical leave under the FMLA. After her discussion with HRD Calcaterra, Saga Defendants were on notice that Ms. Kirshbaum would need to take FMLA leave if Saga refused to allow her to work from home.

127.   On multiple occasions, Ms. Kirshbaum linked her requests to work from home with her chronic lung infections. When Saga Defendants gave Ms. Kirshbaum the ultimatum to return to in-person work or face termination, they interfered with Ms. Kirshbaum's right to take a period of unpaid leave in order to comply with her doctor's recommendations.

128.    Saga Defendants acted willfully, with malice, or with reckless indifference to Ms. Kirshbaum's rights protected by the MWPA, MHRA, ADA, ADEA, GINA, Title VII, and FMLA.

129.    Ms. Kirshbaum is pursuing all possible methods of proving this discrimination, including but not limited to, unthinking stereotype, unconscious bias, unthinking bias, or implicit bias; circumstantial and direct evidence; pretext evidence; as well as causation based on one or more discriminatory or unlawful but-for causal factors along with other non-discriminatory or lawful but-for causal factors; a single discriminatory or unlawful motive or cause; or mixed motives or but-for causes including at least one discriminatory or unlawful motive or motivating factor.

130.    As a direct and proximate result of Saga Defendants' intentional discrimination and retaliation, Ms. Kirshbaum has suffered and will continue to suffer damages including, but not limited to, back pay and benefits, loss of self-confidence and self-respect, humiliation and embarrassment, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of her job and of her life, injury to reputation, injury to dignity and personal wellbeing, and other pecuniary and non-pecuniary losses.

131.    Wherefore, Plaintiff requests relief against Saga Defendants as follows:

(a)   Enter declaratory relief that Saga Defendants violated Plaintiff's statutory civil rights to be free of discrimination because of her genetic information, disability, age, and sex discrimination and unlawful retaliation;

(b)   Enter injunctive relief ordering that Saga Defendants (1) reinstate Plaintiff; (2) provide Plaintiff with reasonable accommodations for her disabilities; (3) provide effective civil rights training for all managerial employees, with authority over Plaintiff's former workplace, on the requirements of all applicable laws prohibiting employment discrimination because of genetic information, disability, age, and sex, and unlawful retaliation against employees for requesting reasonable accommodations that must be completed within 60 days of the entry of Judgment for Injunctive Relief.

(c)   Award Ms. Kirshbaum back pay for lost wages and benefits and prejudgment interest thereon;

(d)   Order reinstatement or, in lieu thereof, front pay for future lost wages and benefits;

(e)   Award Ms. Kirshbaum liquidated damages on her claim under the ADEA in an amount equal to the amount of back pay and benefits due to her;

(f)    Award Ms. Kirshbaum liquidated damages on her claim under the FMLA in an amount equal to the amount of back pay and benefits due to her (including prejudgment interest thereon);

(g)    Award compensatory damages in amounts to be determined at trial by the jury and prejudgment interest thereon;

(h)    Award punitive damages in amounts to be determined at trial by the jury and prejudgment interest thereon;

(i)    Award Plaintiff full costs and reasonable attorney's fees; and

(j)    Award such further relief as is deemed appropriate.

Respectfully submitted,

Date: April 28, 2023

/s/ David G. Webbert
David G. Webbert, Esq.
Johnson & Webbert, LLP
1 Bowdoin Mill Island, Ste. 300
Topsham, ME 04086
Tel: (207) 623-5110
dwebbert@work.law

/s/ Ryan M. Schmitz
Ryan M. Schmitz, Esq.
Johnson & Webbert, LLP
1 Bowdoin Mill Island, Ste. 300
Topsham, ME 04086
Tel: (207) 623-5110
rschmitz@work.law

/s/ Sarah K. Austin
Sarah K. Austin, Esq.
Johnson & Webbert, LLP
1 Bowdoin Mill Island, Ste. 300
Topsham, ME 04086
Tel: (207) 623-5110
saustin@work.law

*Attorneys for Plaintiff*

### Certificate of Service

I hereby certify that on April 28, 2023, I electronically filed Plaintiff's First Amended Complaint with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

Shiloh D. Theberge, Esq.
William J. Wahrer, Esq.
Carolyn A. Liegner, Esq.
stheberge@bernsteinshur.com
wwahrer@bernsteinshur.com
cliegner@bernsteinshur.com


Date: April 28, 2023          /s/ David G. Webbert
                              Johnson & Webbert, LLP
                              1 Bowdoin Mill Island, Ste. 300
                              Topsham, ME 04086
                              Tel: 207-623-5110
                              dwebbert@work.law